NEILL *v.* NEILL.

257 S. W. 2d 26

Opinion delivered April 6, 1953.

Rehearing denied May 11, 1953.

*A. A. Thomason* and *Henry B. Whitley,* for appellant.

*Harry Crumpler* and *W. A. Eckert, Jr.,* for appellee.

GRIFFIN SMITH, Chief Justice. Appellants, who were plaintiffs below, sought to have a trust declared in respect of 320 acres formerly owned by James E. Neill, who died intestate in 1901, leaving a widow and ten children, one of whom was J. A. Neill who became a well-known physician and surgeon. Dr. Neill was the oldest child and had been practicing his profession about eighteen months when his father died. James E. Neill's widow died in 1906. Six of the ten children were living when this suit was brought. Four were minors when their father died. Before taking medical courses Dr. Neill attended Hendrix College and Draughon's Business College. He became a stockholder in Bienville Lumber Company and was physician and surgeon for that organization, with headquarters at Laberta, La.

Shortly after James E. Neill died one of his sons, W. B., or "Bert" Neill, was made administrator of the estate, the purpose—as expressed by a sister who was a plaintiff in this action—being to collect and distribute insurance amounting to $800. There are frequent references to a contention that W. B. filed but one report and that the administration has not been closed. The controversy does not involve the insurance money or other personal property; nor does it question disposition of a separate tract of 120 acres owned by James E. Neill, and a lot in the town of Waldo.

*Controversial Issues.*—The land embracing 320 acres was purchased by appellants' ancestor in 1873. At that time the St. Louis Southwestern Railway had not been

built through Columbia county and the town of Waldo did not exist. The acreage acquired by James E. Neill, however, is near Waldo. The amount paid for the acreage is a matter of dispute. In copying the deed record the clerk thought the consideration was $10,000, but by agreement a photostatic copy has been brought up—the original deed having been lost. The work is typical of the care exercised by skilled penmen of that period; and, although the written word might be mistaken for "ten", we feel certain that "two" was intended. The letter following t does not resemble an e, as will be seen from the inset plate.

Through January, 1909, and until September 26, 1913, Dr. Neill procured deeds from eight of his brothers and sisters, each of whom was of full age when the deed was executed. The amounts ranged from $912.82 paid W. B. Neill to a low of $600 to four others. One was paid $623.33, another $700, and another $800. In procuring some of the deeds Dr. Neill called personally; other deeds were sent by mail and so returned. The total paid for eight of the ten shares was $5,436.15. There was testimony that in one or two instances some of the money was withheld to be paid to another, but no contention is made that this was contrary to wishes of the parties. There was testimony that Dr. Neill sold or permitted to be sold $2,000 worth of timber from the place.

Dr. Neill did not acquire the interest one of his sisters would have inherited had she not predeceased her father. She left two children. Their guardian petitioned for partition and in consequence of a settlement the children received the separate tract of 120 acres heretofore referred to.

About 1915 the Bienville Lumber Company moved to Mississippi and Dr. Neill went along, residing at Forest. He died Sept. 4, 1942, survived by his widow. The following April W. B. Neill bought the land (less half the minerals) from Dr. Neill's widow and children, paying $20 per acre, or $6,400. For a number of years Dr. Neill experienced nervous attacks and at times was unable to attend to business, although a deposition by one of his attorneys spoke of the affliction as intermittent. The attorney said that prior to the nervous seizures Dr. Neill was a highly intellectual—even brilliant—man, and that he had the full confidence of all who knew him. His death is referred to as having occurred "on the Bahama Islands". He was adjudged incompetent in 1931, and again in 1939.

W. B. Neill testified that he remained on the farm for a long time after his father died, took general control, helped rear the younger children, and permitted them to buy anything reasonable and charge the amount to his account. This continued until he married and it became apparent that the arrangement could not continue indefinitely. One of the brothers, "Ed", refused to help with farming operations and there was general dissatisfaction on that account. After marrying W. B. moved "to town", but told his mother and a sister they were welcome to live with him as long as they wanted to.—"Ed was old enough and big enough to take care of himself. I had looked after him for four years, so I thought he should take care of himself". But his mother and a sister went to live with Mrs. Fincher, one of the girls who had married. After four months, according to W. B., Mrs. Fincher got tired of her mother "and threw her things out and sent her to my house to die".

This arrangement continued during the brief remaining period of Mrs. Neill's lifetime. Dr. Neill (according to W. B.'s testimony) concluded that this brother had faithfully discharged his obligations and that from a credit standpoint matters stood in W. B.'s favor. The Doctor thereupon suggested that W. B. return to the farm and operate it for a few years, rent-free. Dr. Neill paid the taxes. Before Dr. Neill bought the several interests Mrs. Fincher was dissatisfied. She insisted that the property be divided, but wanted 32 acres (a tenth) "right up here nearly to town". Dr. Neill offered her ten acres. When Mrs. Fincher failed to get the full acreage she began trying to sell her interest. It was then, according to W. B., that Dr. Neill concluded to buy the outstanding shares, the purpose being to keep the property intact. Mrs. Fincher's version of this transaction was that she begged for ten acres "as my part of the 320-acre estate".

If the Chancellor, or we, could accept Mrs. Fincher's version of why the various brothers and sisters sold to Dr. Neill the situation would resolve itself into one wherein the dominant brother—the older member of the family whom all others had been taught to "look up to" and obey with implicit faith, bought the individual shares with no idea of personal profit and with complete disregard concerning recoupment of the money thus expended. The Doctor's plan, according to Mrs. Fincher and those who supported her testimony, was to acquire the estate, keep it in repair, pay taxes, and depend upon rentals for reimbursement; then, as a final gesture to family loyalty and affection, he would will the property to each interest-holder. Her brother did not, in so many words, say that he was holding the property in trust, or that he intended to keep a promise made to his father— that the land would be retained intact for all of the children,—"but all through the years he said things that would indicate he had nothing else in mind".

Mrs. Fincher was questioned regarding a lease executed by Dr. Neill's widow and children conveying an undivided fourth interest in minerals pertaining to

the 320-acre tract. This lease was in the name of Lester A. Fincher as trustee. Mrs. Fincher strongly asserted that she had been ''double-crossed'' by her son and others; that as soon as she ascertained what had occurred she demanded that the title be ''put back in L. E. Fincher's name''.

Before W. B. concluded his purchase Mrs. Fincher had undertaken to buy the land from Dr. Neill's widow and children, and at one time the widow had agreed to sell to her. In explaining why she attempted to purchase the property at a time when she was claiming an undivided interest in trust, Mrs. Fincher said that her trip to Mississippi was in response to a letter from Mrs. Neill. She did not tell the Doctor's wife that her purpose was to acquire the property for the benefit of herself and her brothers, sisters, nieces and nephews:— ''I didn't think about it and didn't see where it was necessary''. Oil and gas royalties were at one time selling for $50 per acre. Mrs. Fincher had not tendered mineral or royalty deeds to others she now says were owners of the land, but she was ''looking after their interests''.

Further testifying, W. B. said that he had given three of his five children small homesite tracts and had sold other parts of the property to them. These children had built homes on the lands. Of the original 320 acres, 66 were undisposed of.

Not all of the descendants of the common ancestor joined in demanding distribution. Mrs. John P. Cox, James E. Neill's daughter and therefore W. B.'s sister, wrote from Hope that she unequivocally sold her interest to Dr. Neill. The transaction was voluntary, and ''there was no expectation whatsoever that my part of the J. E. Neill estate would ever be reconveyed to me''. In another letter she said: ''I do not own any part of that land; and furthermore I do not think it right to bring suit against my brother Bert. . . . I refuse to go to court or be a party to defeating [my brother's claim]''.

The complaint was filed March 20, 1950—more than 36 years after the last of the eight deeds was executed

and 43 years after delivery of the first. It is urged that Dr. Neill's nervous condition was of such a nature that those presently claiming or their predecessors were reluctant to discuss business with him for fear of adding irritation to an existing illness. There is evidence, however, that the Doctor was employed by the Lumber Company during the greater portion of this time, and it is inferable that after the first adjudication of insanity in 1931 and before the second commitment in 1939 he had lucid intervals. The Doctor was represented by competent counsel, including Hon. Percy M. Lee, now a distinguished member of the Mississippi Supreme Court.

It is convincingly shown that Dr. Neill did not leave a will, and it is equally clear that his course of conduct was one dominated by a desire to deal fairly with his brothers and sisters. That he should have intended to will the home place to those from whom he purchased is not inconceivable, but if this purpose actuated his conduct in procuring the deeds his failure to leave some memorandum expressive of that intent is contrary to life habits, methodical training, and a course of fair dealings.

Mrs. Fincher, quite obviously, was in a sense the agent of other members of the family in provoking the litigation. The testimony of most of those associated with her is of a pattern conforming to her theory that an implied, constructive, or resulting trust came into being with assurances by Dr. Neill that the overall purpose in procuring deeds was to keep the farm intact and return it to his brothers and sisters or their heirs when his own course had been run.

The Chancellor's views were that the amounts paid to the various grantors were substantial. In the short opinion there is no suggestion that the trial court believed the payments to have been inadequate or that they were made in circumstances leading a reasonable person to believe that the transactions were other than buy and sell on unconditional bases. The rule is that implied, constructive, or resulting trusts must be established by clear and convincing evidence—something more than a preponderance. *Barger* v. *Baker,* 218 Ark. 457, 237 S. W.

2d 37. The case cites *Ripley* v. *Kelly*, 207 Ark. 1011, 183 S. W. 2d 793, where it was said that the evidence must be "full, free and convincing".

Tested by this rule the Chancellor correctly dismissed the cause for want of equity.

Affirmed.